IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Christina Raifsnider,

          Plaintiff,                      Case No. 3:13 CV 2228

    -vs-

                                      MEMORANDUM OPINION
                                      AND ORDER

Lonz Winery, Inc., dba
Mon Ami Restaurant,

          Defendant.

## INTRODUCTION

Plaintiff Christina Raifsnider initiated this action against Defendant Lonz Winery, Inc., doing business as Mon Ami Restaurant ("Mon Ami" or the "Company") for sexual harassment, retaliation, and constructive discharge. (Doc. No. 1).

Before me is Mon Ami's motion for summary judgment. (Doc. No. 21). Plaintiff filed an opposition (Doc. No. 22), and Mon Ami filed a reply (Doc. No. 27). For the reasons stated below, Mon Ami's motion is granted.

## BACKGROUND

Plaintiff was employed as a waitress by Mon Ami and Crow's Nest Restaurant. (Doc. No. 20-1 at 5). Mon Ami has an employee handbook which includes an anti-harassment policy prohibiting illegal harassment. (*Id.* at 11). The handbook provides that if employees have questions, or feel they have experienced or witnessed harassment, they should immediately contact Company President John Kronberg or District Manager Peggy Kronberg. (*Id.*). Plaintiff received a copy of this handbook, read it, and agreed to abide by it. (*Id.*).

Plaintiff's claims center on incidents involving her co-worker, John Erwin, during her employment at the Crow's Nest Restaurant in the Spring of 2012. (Doc. 1 at ¶ 9). Plaintiff testified Erwin "started out with nice and kind comments," however later on, "the comments turned crude and vulgar." (Doc. No. 20-1 at 14). Before the comments took a turn, however, Plaintiff admitted she was trying to handle the situation with Erwin on her own. (*Id.* at 15).

On March 24, 2012, Erwin's comments escalated and his behavior turned physical – Plaintiff discovered Erwin's phone number in her pocket and he started "pushing up on her" saying "he was horny." (*Id.*). At this point, Plaintiff reported Erwin's behavior to manager Jenn Bailey "because [she] was uncomfortable." (*Id.*). Plaintiff and Bailey agreed they would tell Erwin to "knock it off" and "be more professional," or they would report Erwin's conduct to John or Peggy Kronberg. (*Id.*). Later that same evening, before they had a chance to talk with Erwin, an incident occurred that caused Bailey to report Erwin's conduct to John and Peggy Kronberg immediately.

At approximately 9:30 p.m., Plaintiff was preparing silverware when Erwin sat next to her and began making comments about "wanting" her. (*Id.* at 15). Plaintiff briefly touched Erwin's leg and said, "It's never going to happen, I am married, can you please just, you know, please stop." (*Id.* at 12, 15). Shortly thereafter, Erwin asked Plaintiff to take a linen bag to the backroom, even though this was not one of Plaintiff's regular duties. (*Id.* at 16). Plaintiff felt "eerie" about going to the backroom because Erwin had previously told her "there were no cameras [in back] to record what was going on." (*Id.* at 16). Erwin followed her into the backroom and shut the door. (*Id.* at 16). Erwin begged Plaintiff for a hug and pulled her towards him. (*Id.* at 16). Plaintiff agreed to give him one hug in an attempt to leave the room. (*Id.* at 16-17). When Erwin began "kissing her neck" and "rubbing down her body," Plaintiff "pushed him off," opened the door, and walked out. (*Id.* at 16).

Plaintiff reported the incident to Bailey, who reported it to John and Peggy Kronberg. (*Id.* at 13). Erwin was suspended immediately and placed on leave until the Company could complete an investigation. (*Id.* at 9, 14). Directly after, John Kronberg and two other employees conducted an investigation. (*Id.* at 14).

During Plaintiff's interview, she described what happened in detail. Plaintiff told Mr. Kronberg she never felt she was in any real danger, and that Erwin was "simply not using his head or thinking things through." (*Id.* at 16-17). Prior to the physical altercation on March 24, 2012, Plaintiff said she had not reported Erwin's behavior because she wanted to handle the situation herself. (*Id.* at 17). She said Erwin had been good to her up until the incident and she had no reason to believe an incident with Erwin would occur. (Doc. No. 23 - Audio, Track 2 at 8 minutes 20 seconds; Doc. No. 20-1 at 16). Bailey had witnessed some of Erwin's comments and Plaintiff's response that she was married prior to the March 24, 2012 incident; however, Bailey said she assumed Plaintiff was handling the situation. (Doc. No. 20-1 at 15; Doc. No. 23 - Audio, Track 3 at 2 minutes 30 seconds).

Plaintiff felt that if she had reported Erwin's conduct earlier, the kissing incident might not have happened. (Doc. 20-1 at 18). She added that Erwin was a good employee and felt he "just didn't use his head and made a bad decision." (*Id.* at 18). Plaintiff also testified, to her knowledge, no one in management at Mon Ami had any reason to believe Erwin had a propensity for sexual harassment. (*Id.* at 3).

Plaintiff did not want Erwin to be fired because she did not believe Erwin was a threat. (*Id.* at 18). As long as she did not have to work with him, Plaintiff did not object to Erwin continuing to work for the Company. (*Id.* at 19). The Company, therefore, demoted Erwin, transferred him to a different restaurant (Crabby Joe's), and made sure Plaintiff would never have to work with him again. (*Id.* at 20). Plaintiff and Mr. Kronberg also agreed it would be best to transfer Plaintiff from

3

the Crow's Nest, where she was working when the incident occurred, to the more upscale Mon Ami, where she had an opportunity to make more money in tips. (*Id.* at 21). Plaintiff thought the Company's response to the incident was prompt, and she was confident the Company was sincere in trying to make sure Plaintiff would never run into Erwin again. (*Id.* at 19, 22).

Plaintiff worked for Mon Ami until late June 2012, when she obtained a new job and resigned due to issues that arose after the incident. The parties agree these issues, further described below, involved: 1) the way Mrs. Kronberg handled Plaintiff's request to use the bathroom during one of her shifts; 2) the number of tables she was assigned during her shifts; and 3) the Company's decision to "call her off" on June 24, 2012. (*Id.* at 23).

The "restroom incident" occurred on a busy day at the Crow's Nest when Plaintiff's tables were full. (*Id.* at 23). Plaintiff asked to use the restroom after she arranged for Bailey to watch her tables. (*Id.* at 23). Mrs. Kronberg, worried about making sure customers were taken care of, asked Plaintiff if she could run meals that were ready before she took a break. (*Id.* at 23). Because Plaintiff said it was an emergency, Mrs. Kronberg allowed the break and said she would make sure Plaintiff got a break every hour to use the restroom. (*Id.* at 23). Plaintiff felt humiliated by this exchange because it took place in front of the kitchen staff, and she was frustrated Mrs. Kronberg gave two of her tables to another waitress. (*Id.* at 23). Plaintiff, however, worked the remainder of her shift without incident. (*Id.* at 23).

Plaintiff's concern about the number of tables she was assigned relates to her perception regarding her opportunity to earn tips. Plaintiff claims she was assigned fewer tables than other waitresses at Mon Ami because she had complained about Erwin's conduct. (*Id.* at 23). Because her hours were not reduced, Plaintiff agreed that a fair way to test the accuracy of her loss of tips as a result of the alleged table reduction, in general, would be to compare her total wages and her average hourly rate during May and June 2011 (before she complained) with her total wages and her average

4

hourly rate during May and June 2012 (after she complained). (*Id.* at 26). While that comparison shows Plaintiff earned substantially more during the time period after she complained, Plaintiff pointed out that her sections were not as good prior to 2012 because she was a newer employee at that time. (*Id.* at 26; Doc. No. 21-2 at 2).

The final incident began on Saturday, June 16, 2012, after Plaintiff voluntarily picked up an un-assigned table on a busy night. (Doc. 21-1 at 26). Plaintiff and Mrs. Kronberg had a difference of opinion about whether Plaintiff was taking care of her tables properly. (*Id.* at 26-27). Three other waitresses then reported to Mrs. Kronberg that Plaintiff called her a "f---ing b----." (*Id.* at 27). Plaintiff denied saying this, but understood why hearing these reports from three employees would make Mrs. Kronberg upset. (*Id.* at 27). When Plaintiff came to work the next day (Sunday June 17, 2012), Mrs. Kronberg called Plaintiff to her office for a meeting. (*Id.* at 29-31). Even though Plaintiff denied using foul language, Mrs. Kronberg sent Plaintiff home for the day. (*Id.* at 29-31, 136). Mrs. Kronberg instructed Plaintiff to return for her next scheduled shift once she "reevaluated her attitude." (*Id.*).

Plaintiff left Mon Ami that day (Sunday June 17, 2012) and applied for a position as a waitress at the Catawba Island Club. (*Id.* at 4). Plaintiff returned for her next scheduled shift at Mon Ami on Thursday June 21, 2012. (*Id.* at 31). Plaintiff worked that day as well as her regularly scheduled shifts on Friday June 22, 2012, and Saturday June 23, 2012. (*Id.*). Plaintiff was then "called off" from her shift on Sunday June 24, 2012. (*Id.* at 31, 40). Plaintiff was frustrated because she had never been called off on a Sunday. (*Id.* at 40). She was informed she was not needed because the lawn would be closed due to possible rain. (Doc. No. 22-2). Plaintiff believed this explanation was false, however, because she and a friend drove to Mon Ami and viewed guests being served on the lawn. (Doc. No. 22-3).

5

At this time, Plaintiff quit her job at Mon Ami because she had been offered a position at the Catawba Island Club. (Doc. No. 20-1 at 31). The parties agree that (either Sunday June 24, 2012 or a few days later) Plaintiff called Mrs. Kronberg to tell her she quit. (Doc. No. 20-1 at 31). Before hanging up, Plaintiff added, "Since you wanted to suspend me for something I never did, now I will say to you that I do think you're a f---ing b----!" (*Id.* at 31).

## STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may meet this burden by demonstrating the absence of evidence supporting one or more essential elements of the non-movant's claim. *Id.* at 323–25.

Once the movant meets this burden, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)). Rule 56 "requires the [non-moving] party to go beyond the pleadings" and present some evidence in support of its position. *Celotex*, 477 U.S. at 324; s*ee also Harris v. General Motors Corp.*, 201 F.3d 800, 802 (6th Cir. 2000). The non-moving party "need only present evidence from which a jury might return a verdict in his favor" in order to establish a genuine dispute as to a material fact. *Anderson*, 477 U.S. at 257. Summary judgment shall be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

6

In considering a motion for summary judgment, a court "must view the facts and draw all reasonable inferences therefrom in a light most favorable to the nonmoving party." *Williams v. Belknap*, 154 F. Supp. 2d 1069, 1071 (E.D. Mich. 2001) (citing *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir.1987)). "At the summary judgment stage[,] the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Ultimately, a court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52; *see also Atchley v. RK Co.*, 224 F.3d 537, 539 (6th Cir. 2000).

## DISCUSSION

Plaintiff asserts three claims: 1) sexual harassment in violation of Ohio Rev. Code §§ 4112.02(A) and 4112.99; 2) retaliation pursuant to Title VII of the Civil Rights Act, 29 U.S.C. 2000e; and 3) constructive discharge. (Doc. No. 1). Mon Ami argues it is entitled to summary judgment because Plaintiff has not established a prima facie case of sexual harassment or retaliation, and as a result her constructive discharge must also fail. Each claim is taken in turn.

**A. Hostile Work Environment**

To establish a prima facie case for sexual harassment/hostile work environment, a plaintiff must prove: "(1) that she was a member of a protected class; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based on sex; (4) that the harassment unreasonably interfered with her work performance by creating a hostile, offensive, or intimidating work environment; and (5) that there is a basis for employer liability." *Thornton v. Fed. Express Corp.*, 530 F.3d 451, 455 (6th Cir. 2008).[1]

---

[1] Claims for sexual harassment brought under Ohio Rev. Code § 4112 are evaluated using the federal evidentiary standards and analysis used under Title VII. *Scandinavian Health Spa, Inc. v. Ohio Civil*

7

To meet the fourth requirement, the harassing conduct must be "severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as abusive." *Thornton v. Fed. Express Corp.*, 530 F.3d 451, 455 (6th Cir. 2008). Mon Ami, without conceding Erwin's conduct was severe or pervasive, focuses solely on the fifth element for purposes of summary judgment – that there is no basis for employer liability.

An employer's liability for harassment under Title VII depends on "whether the harasser is a 'supervisor' or simply a co-worker." *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2439 (2013). In cases where the harassment of a supervisor culminates in a tangible employment action, the employer is strictly liable. *Vance*, 133 S. Ct. at 2439. "If the harassing employee is the victim's co-worker, [however], the employer is liable only if it was negligent in controlling working conditions." *Id.* For an employer to be liable under the co-worker theory, a plaintiff must establish that the employer knew or should have known of the harassment and failed to take prompt and appropriate corrective action. *McCombs v. Meijer, Inc.*, 395 F.3d 346, 353 (6th Cir. 2005).

The parties agree Erwin was not Plaintiff's supervisor, and therefore Mon Ami is not strictly liable. Plaintiff argues Mon Ami is liable under the co-worker theory, however, because manager Jenn Bailey had witnessed inappropriate comments prior to the March 24, 2012 incident. And therefore, Erwin's propensity for sexual harassment was foreseeable.

I do not agree that Bailey's knowledge of Erwin's unspecified comments made his conduct on March 24, 2012 foreseeable. Prior to the incident, Plaintiff felt Erwin was good to her and characterized Erwin's comments as "nice and kind." (Doc. No. 20-1 at 14). Erwin's comments began to escalate, however, in the months leading up to the incident. Instead of reporting Erwin's

---

*Rights Comm.*, 581 N.E.2d 1169 (Ohio App. Ct. 1990) (Title VII standard adopted for "hostile environment" sexual harassment claims).

comments, as required by Mon Ami's employee handbook, Plaintiff chose to handle the situation on her own.

Dispositive here, and coupled with the fact that Plaintiff failed to report Erwin's behavior, Plaintiff testified no one in the Company, including management, had any reason to believe Erwin had a propensity for sexual harassment. Indeed, Plaintiff agreed the Company was "blind-sided" by the March 24, 2012 incident and "never saw [it] coming." (Doc. No. 20-1 at 19). Moreover, despite Erwin's unacceptable behavior on March 24, 2012, Plaintiff said she never felt threatened by Erwin and thought he had just made a bad decision. *See Thornton*, 530 F.3d at 455 ("the victim must subjectively regard [her] environment as abusive."). Because Plaintiff admits Erwin's conduct on March 24, 2012 was not foreseeable, I conclude Plaintiff has failed to establish a hostile work environment claim related to his comments prior to this incident.

Regarding the events of March 24, 2012, the record establishes as soon as Plaintiff reported Erwin's behavior, the Company took immediate action to investigate and resolve the situation. Plaintiff testified she thought the Company's response to the incident was prompt, and she was satisfied with how the Company resolved the matter. Because the Company took immediate action when they were notified, the Company is not liable for sexual harassment regarding Erwin's conduct towards Plaintiff.

**B. Retaliation**

To establish a prima facie case of retaliation, a plaintiff must demonstrate that: (1) she engaged in activity protected by Title VII; (2) the defendant knew of her protected activity; (3) thereafter, the defendant took "materially adverse" action against the plaintiff; (4) a causal connection existed between the protected activity and the materially adverse action. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533-34 (2013); *Jones v. Johanns*, 264 F. App'x 463, 466 (6th Cir. 2007).

9

The third element requires a plaintiff to show "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a complaint of discrimination." *Burlington v. Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). Plaintiff's burden of establishing a materially adverse action is less onerous in the retaliation context than in the anti-discrimination context. *Laster v. City of Kalamazoo*, 746 F.3d 714, 731 (6th Cir. 2014). For example, "[f]acing heightened scrutiny, receiving frequent reprimands for breaking selectively enforced policies, [and] being disciplined more harshly than similarly situated peers . . . might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Laster*, 746 F.3d at 732.

In analyzing the significance of any given act of retaliation, however, "'context matters.'" *Laster*, 746 F.3d at 731 (quoting *Burlington*, 548 U.S. at 69). "An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work." *Burlington*, 548 U.S. at 69.

The fourth element requires the plaintiff to prove that "'the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.'" *Laster,* 746 F.3d at 731 (quoting *Nassar*, 133 S. Ct. at 2533). In other words, "Title VII retaliation claims must be proved according to traditional principles of but-for causation." *Nassar,* 133 S. Ct. at 2533.

The parties appear to agree Plaintiff has established the first two elements. The parties dispute whether Mon Ami took any materially adverse actions against Plaintiff, and, if so, whether there was a causal connection between a protected activity and such action.

Plaintiff argues the following actions were materially adverse: 1) the way Mrs. Kronberg handled her request for an emergency bathroom break; 2) the Company's table assignments after she was transferred to Mon Ami; and 3) the Company's decision to suspend Plaintiff for vulgar language and then call her off during a scheduled shift. (Doc. No. 22 at 2-3). Defendant argues

10

these actions were not materially adverse, nor was there a causal connection between a protected activity and these actions.

I find the emergency restroom incident was not a materially adverse action. Plaintiff offers no evidence to show this incident was anything more than a petty slight or minor annoyance in the normal course of running a busy restaurant. *See Burlington*, 548 U.S. at 68 (Title VII "does not set forth a general civility code for the American workplace."). At the time Plaintiff attempted to use the restroom, she acknowledged the restaurant was crowded and all of her tables were full. (Doc. No. 20-1 at 23). Plaintiff also acknowledged Mrs. Kronberg was concerned about making sure the customers were taken care of on such a busy night, and therefore asked Plaintiff to run food before she took a break. (*Id.*). Simply put, delaying a bathroom break to run food on a busy night at a restaurant would not dissuade a reasonable worker from making a charge of harassment. At most, Plaintiff offers her testimony that she was embarrassed or humiliated by this exchange with Mrs. Kronberg; but this is not the type of conduct Title VII is designed to redress. *See Goodsite v. Norfolk Southern Ry. Co.*, 573 F. App'x 572, 584 (6th Cir. 2014) (a plaintiff's testimony of her subjective fear or dislike of certain co-workers was not actionable under Title VII).

Plaintiff's second allegation – that she was assigned fewer tables after she complained about Erwin's conduct – is also insufficient to constitute a materially adverse action. Plaintiff alleges she was assigned fewer tables, which reduced her opportunity to earn tips. Plaintiff cites *Alexander v. Casino Queen, Inc.*, 739 F.3d 972 (7th Cir. 2014), to support her claim that floor reassignments may constitute adverse employment actions in the context of retaliation claims. In *Alexander*, however, the driving force in the court's determination was the significant negative financial impact on the waitresses as a result of the reassignments. 739 F.3d at 980. In *Alexander*, each waitress was assigned to cover a specific area of the casino floor. *Id.* at 975. It was undisputed that some areas were more desirable monetarily than others. *Id.* The plaintiffs in *Alexander* alleged, despite their

11

seniority, white waitresses were almost always reassigned to the lucrative areas to cover for senior waitresses who had called off or took vacation. *Id.* The plaintiffs alleged these reassignments occurred up to twice a week and cost them about $50 a day. *Id.* In making its determination, the court stated:

> the floor reassignments in this case constitute an adverse employment action because of the relative importance that tips had for these cocktail waitresses, given their compensation structure and the alleged frequency of these reassignments. Together, these points demonstrate a significant financial impact . . . . we credit plaintiffs' allegation that Casino Queen supervisors knew that some areas average higher tips than others.

*Id.*

Here, however, Plaintiff has failed to demonstrate any negative fiscal impact as a result of being assigned fewer tables. Rather, after she reported Erwin's conduct, it is undisputed Plaintiff was transferred to a different restaurant where she would have the opportunity to earn *more* money in tips. Moreover, a comparison of Plaintiff's total wages and average hourly pay in May and June 2011 (before she complained) and her total wages and average hourly pay in May and June 2012 (after she complained) confirms Plaintiff earned substantially more after she complained. (Doc. 21-1 at 2).

In addition, the record reveals Plaintiff was assigned the same number of tables as, or more than, the majority of her co-workers. (Doc. 20-1 at 33-36). This evidence is based on table assignment charts taken by Plaintiff from Mon Ami for the shifts she worked on June 21, 22, and 23, 2012. (*Id.*). These shifts took place almost three months after she had complained about Erwin. (*Id.*). Accordingly, I conclude the table assignments were not materially adverse, nor were they related to her complaint about Erwin.

I am also not persuaded Plaintiff's one-day suspension for allegedly calling Mrs. Kronberg a "f---ing b----" was related to reporting Erwin's conduct. Plaintiff testified she and Mrs. Kronberg had a difference of opinion as to how she was handling her tables. Plaintiff also testified she was

12

aware that three servers told Mrs. Kronberg Plaintiff had called her a derogatory name and understood why this would upset Mrs. Kronberg.  While Plaintiff denied using such vulgar language, she returned for her next three scheduled shifts and worked without incident.  Plaintiff has presented no evidence showing she was sent home because she had reported Erwin's conduct three months prior.

Finally, Plaintiff argues her complaint about Erwin was the reason she was "called off" work "due to the timing of these issues."  (Doc. No. 22 at 13).  Even assuming the "call off" incident was materially adverse, Plaintiff has failed to establish causation, i.e., that she would not have been called off but for her complaints about Erwin.

Temporal proximity alone may be enough to establish causation.  *Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497, 505 (6th Cir. 2014).  "But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality."  *Id.*  (quoting *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008)).  The only evidence Plaintiff presents are affidavits to make the point that the lawn was not closed the day she was called off.  Plaintiff presents no evidence the "but for" cause of her call off was related to her complaint three months earlier.  Instead, Plaintiff seems to argue Mrs. Kronberg resented her because three co-workers accused Plaintiff of calling Mrs. Kronberg a "f---ing b---." (Doc. No. 22 at 12).  Because Plaintiff fails to establish how this shows a causal connection between the "call off" incident and Plaintiff's prior complaints about Erwin, the Company is not liable for retaliation.

## C. Constructive Discharge

Finally, Plaintiff brings forth a constructive discharge claim.  She relies on the same alleged retaliatory conduct as support – the emergency restroom incident, fewer table assignments, and the "call off" incident.

"To demonstrate a constructive discharge, Plaintiff must adduce evidence to show that 1) the employer . . . deliberately created intolerable working conditions, as perceived by a reasonable person, and 2) the employer did so with the intention of forcing the employee to quit." *Logan v. Denny's Inc.*, 259 F.3d 558, 568–69 (6th Cir. 2001) (internal quotation marks and citation omitted). When evaluating a claim of constructive discharge, I must consider "both the employer's intent and the employee's objective feelings." *Id.* at 569. "'A constructive discharge exists if working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'" *Ford v. Gen. Motors Corp.*, 305 F.3d 545, 554 (6th Cir. 2002) (quoting *Yates v. Avco Corp.*, 819 F.2d 630, 636–37 (6th Cir. 1987)). "A plaintiff must show that the employer intended and could reasonably have foreseen the impact of its conduct on the employee." *Id.*

The record does not reflect Mon Ami constructively discharged Plaintiff. Rather, the record reveals Plaintiff made a personal decision to change employment. As previously explained in my discussion of Plaintiff's hostile work environment claim, Mon Ami took reasonable steps to address the concerns about co-worker harassment raised by Plaintiff. Plaintiff was satisfied with the Company's response to her complaints and the resolution therefrom. While Plaintiff's exchange with Mrs. Kronberg regarding her emergency restroom request was certainly "humiliating" from her point of view, it would not compel a reasonable person in Plaintiff's shoes to resign. To be sure, Plaintiff finished the remainder of her shift without incident and continued to work at Mon Ami.

Concerning her "suspension," Plaintiff agreed she and Mrs. Kronberg had a difference of opinion as to how she was handling her tables. When Plaintiff's co-workers told Mrs. Kronberg Plaintiff called her a derogatory name, Plaintiff was sent home. Even though Plaintiff applied for employment elsewhere, she returned to Mon Ami for her next three scheduled shifts without incident. Plaintiff has failed to put forth any evidence she was "called off" in response to her complaints about Erwin three months prior. These allegations, taken separately or together, simply

do not compel a finding that Mon Ami created working conditions that were objectively intolerable to a reasonable person. Accordingly, Plaintiff's constructive discharge claim is dismissed.

## CONCLUSION

For the reasons stated above, Defendant Mon Ami's motion for summary judgment is granted (Doc. No. 21).

So Ordered.

   s/ *Jeffrey J. Helmick*
United States District Judge
